967 F.2d 1227
 1992-1 Trade Cases P 69,879, 36 Fed. R. Evid.
Serv. 214
UNITED STATES of America, Appellee,
v.
MISLE BUS & EQUIPMENT COMPANY, Appellant.
UNITED STATES of America, Appellee,
v.
Darrell BENNETT, Appellant.
UNITED STATES of America, Appellee,
v.
Julius MISLE, Appellant.
 Nos. 91-1829, 91-1832 and 91-1833.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1991.
Decided June 26, 1992.
 
 Frederic H. Kauffman, Lincoln, Neb., argued (Fredric H. Kauffman, Terry R. Wittler and Andrew D. Strotman, on brief), for appellant Misle Bus & Equipment.
 Robert F. Grimit, Lincoln, Neb., argued, for appellant Darrell Bennett.
 John P. Fonte, Washington, D.C., argued (James F. Rill, Charles A. James, John J. Powers, III, John P. Fonte and Marion L. Jetton, Washington, D.C., on brief, and Kent Brown, Michael W. Boomgarden, James E. Gross and Frank J. Vondrak, Chicago, Ill., of counsel), for appellee.
 Before McMILLIAN, Circuit Judge, and FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Misle Bus & Equipment Company ("MBE"), Julius Misle, and Darrell Bennett (collectively "appellants") appeal from final judgments entered in the United States District Court[1] for the District of Nebraska, upon jury verdicts, finding them each guilty of one count of conspiracy to suppress competition for the sale of school bus bodies to public school districts in Nebraska and western Iowa, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. At sentencing, the district court fined MBE $250,000.00 and ordered the company to pay $270.00 as a special assessment and costs; sentenced Misle to two years imprisonment, fined him $125,000.00 and ordered him to pay $120.00 as a special assessment and costs; and sentenced Bennett to two years imprisonment and ordered him to pay $120.00 as a special assessment and costs. These were non-Guidelines sentences. For reversal, appellants raise numerous issues related to: (1) the sufficiency and weight of the evidence; (2) the admissibility of evidence at trial; (3) the validity of the jury instructions; and (4) the propriety of the sentences. For the reasons discussed below, we affirm the judgments of the district court.
 
 
 2
 MBE, Misle, and Bennett, along with Gerald Smith and Ralph Gregory Walker, were initially charged in a one-count indictment dated January 19, 1989. Walker entered into a plea agreement with the government, in which he agreed to cooperate with the government by providing information and testifying at trial. The remaining four defendants were then charged in a superseding indictment. The superseding indictment charged that, from approximately 1978 continuing through March 1986, MBE, Misle, Bennett, and Smith engaged in an unlawful conspiracy to suppress competition among distributors of school buses and bus parts in the competitive bidding for contracts with school districts in Nebraska and western Iowa. Specifically, the indictment alleged that the four named defendants and other unnamed co-conspirators agreed among themselves to allocate the school districts, rig their contract bids, and fix the prices at which these items were sold to the school districts.
 
 
 3
 Trial in this case began September 5, 1990, and ended October 9, 1990. The government's evidence at trial included the testimony of numerous witnesses who, like appellants, were in the business of distributing buses and bus parts, either as employees of MBE or as officials or employees of other companies. They all either had pled guilty or had been granted immunity prior to testifying at trial. Briefly summarized, the government's witnesses described an ongoing arrangement--the so-called "program"--in which a group of bus distributors met on a regular basis, at least once a year in the fall from as early as 1962 until 1986, to agree upon bus and bus body prices that would be used in submitting contract bids to various school districts. In some instances, these witnesses described specific school district allocations that were made and specific events that took place in carrying out the program agreements.
 
 
 4
 The theory of the defense was essentially denial. Misle testified that he had been approached about joining the program but refused to participate. Misle also presented evidence that he had relinquished daily control over the MBE business in 1979, first putting James Michael Dodds in control, and later in 1983 making his son-in-law, Jeff Mellen, the full-time general manager. Generally, the defense sought to portray MBE as an aggressive competitor, which legitimately rose to become a dominant seller of conventional school bus bodies in Nebraska and western Iowa while other competitors, particularly Gerald Lallman, an employee of United Bus, engaged in an ineffectual scheme to manipulate the market--a scheme for which Lallman and others were now, under grants of immunity, falsely accusing appellants of orchestrating.
 
 
 5
 After a five week trial, the jury returned verdicts of guilty as to MBE, Misle, and Bennett, and not guilty as to Smith. Following sentencing of MBE, Misle, and Bennett on March 4, 1991, appellants filed timely appeals.
 
 The Sufficiency and Weight of the Evidence
 
 6
 Appellants first argue that the evidence is insufficient as a matter of law to support the jury's guilty verdicts. Each of the appellants preserved this issue for appeal by timely filing motions for judgment of acquittal at the close of the government's case and at the end of trial. Appellants argue, in essence, that the evidence was insufficient to convict because of many contradictions and holes in the government's case; the lack of evidence of any explicit agreement; the remoteness and, consequently, the vagueness of much of the evidence; the circumstantial nature of the evidence which merely placed appellants at meetings; and the lack of credibility of the witnesses, many of whom testified under grants of immunity and therefore had an incentive to lie. Appellants specifically contend that the government did not prove the essential elements of the existence of an agreement and their intentional participation in it.[2] Appellants argue that the evidence shows, at best, that MBE sales representatives were simply "feigning" agreement as a means to cheat the program participants.
 
 
 7
 In reviewing the sufficiency of the evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The government must be given the benefit of all reasonable inferences to be drawn from the evidence, and it is sufficient if there is substantial evidence justifying an inference of guilt irrespective of any countervailing testimony that may have been introduced. United States v. Lincoln, 630 F.2d 1313, 1316-17 (8th Cir.1980). Moreover, in a conspiracy case, "[o]nce the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict [the defendant] of knowing participation in the conspiracy." United States v. Hoelscher, 914 F.2d 1527, 1534 (8th Cir.1990) (Hoelscher ), quoting United States v. DeLuna, 763 F.2d 897, 924 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). As to the specific element of agreement, "[t]he agreement may be established by circumstantial evidence, as conspiracies seldom lend themselves to proof by direct evidence." Hoelscher, 914 F.2d at 1533, quoting United States v. Kaminski, 692 F.2d 505, 513 (8th Cir.1982); see also Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) (existence of an agreement may be shown by circumstances indicating that criminal defendants acted in concert to achieve a common goal).
 
 
 8
 According to the government's evidence, Misle participated in the program, both personally and in his capacity as a supervisor of MBE sales representatives, from the 1960s until the program ended in 1986. Government witnesses testified that although Misle occasionally "cheated" his co-conspirators by bidding lower than was agreed, he regularly participated in the program meetings, reached mutual understandings with the other participants about prices and allocations of school districts, and usually adhered to the prices and market allocations upon which they agreed. For example, Lallman testified that he attended nearly two dozen program meetings and that Misle regularly attended those meetings. A former sales representative for MBE, Michael Dodds, testified that he began attending program meetings on behalf of MBE in 1978, shortly after Bennett left MBE to work for United Bus, another bus distributor and competitor of MBE. According to Dodds, he would confer with Misle both before and after these meetings "[b]ecause [Misle] wanted to know what new prices had been reached and what schools [MBE] had received for allocation." Dodds also testified about statements made by Misle in which Misle admitted to fixing prices through the program in order to elevate profits.
 
 
 9
 Many of the government's witnesses also testified about Bennett's participation in the program. Dodds, for example, testified that during the years before Bennett left MBE approximately in 1978, Bennett would calculate bids by referring to allocation sheets produced from program meetings. Based upon these calculations, Bennett and Misle would instruct Dodds on how much to bid for specific contracts. According to Dodds, Bennett continued to attend program meetings on behalf of his new employer, United Bus, after he left MBE in 1978. At that time, Dodds had begun attending program meetings on behalf of MBE. Bennett returned to MBE approximately in 1983 and again began regularly attending program meetings on behalf of MBE. Several witnesses testified to Bennett's participation in the price fixing and market allocation agreements that were reached at these program meetings. Dodds and another former MBE sales representative, Larry Moore, testified that they continued to bid according to instructions from both Misle and Bennett, and that they were told that these bids reflected the understandings reached at the program meetings.
 
 
 10
 As noted above, appellants denied participation in the program. Misle testified that he refused to join the program when approached by Lallman. Appellants also presented evidence that MBE and Misle were aggressive in their pursuit of sales, that Misle personally disliked Lallman, that many contracts were awarded that did not correspond to the government's theory of market allocation/bid-rigging/price-fixing, that Misle relinquished daily control of MBE after 1979, that the market bore no signs of collusion, and that the program was largely unsuccessful.
 
 
 11
 On review of the record, we hold that there was substantial evidence from which the jury could reasonably have inferred appellants' intent to agree and intent to carry out their unlawful objectives--namely, market allocation, price-fixing, and bid-rigging. Given the conflict between the government's witnesses and the defense, the jury's verdicts necessarily turned on credibility determinations. It was within the jury's province to make such credibility determinations, taking into consideration such factors as the incentive to lie. See United States v. Scholle, 553 F.2d 1109, 1119 (8th Cir.) (fact that convictions rested primarily on testimony of accomplices who had strong incentives to lie does not justify reversal; jury decides credibility and accords testimony its proper weight), cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). Accordingly, we hold that the district court did not err in denying appellants' motions for judgment of acquittal.
 
 
 12
 Alternatively, appellants argue that they are entitled to a new trial because the jury's verdicts are against the weight of the evidence. Appellants each timely filed a motion for new trial, which was denied by the district court. In ruling on these motions, the district court was in a position to weigh the evidence, evaluate the credibility of the witnesses, and set aside the verdict only if the evidence weighed so heavily in appellants' favor as to indicate that a miscarriage of justice may have occurred. United States v. Rodriguez, 812 F.2d 414, 417 (8th Cir.1987). On review of the district court's denial of appellants' motion for new trial, "[w]e will not reverse the district court's decision absent a clear and manifest abuse of discretion." Id. Having reviewed the record as a whole, we hold that the district court did not abuse its discretion in denying appellants' motions for new trial.
 
 Evidentiary Rulings
 
 13
 Appellants argue that the district court abused its discretion in making certain evidentiary rulings. Specifically, appellants challenge the admission of the following evidence at trial: (1) the guilty pleas and convictions of alleged co-conspirators; (2) statements made by alleged co-conspirators; (3) evidence of a similar bid-rigging/market allocation scheme involving MBE and Misle in South Dakota between 1978 and 1982; (4) lay testimony that "agreements" to fix prices and allocate the market had been reached; and (5) evidence regarding activities which predated the period covered by the statute of limitations.
 
 
 14
 Appellants argue that the district court abused its discretion in allowing the government to introduce evidence of the guilty pleas of Walker and another distributor, Superior Sales of Nebraska ("SSN"); the contents of Walker and SSN's plea agreements; and testimony by Kraig Brower regarding his conviction in 1988 for bid-rigging in connection with the program. According to appellants, the government improperly used and unduly emphasized this evidence. In essence, appellants claim that the evidence was introduced as substantive evidence, for the impermissible purpose of establishing guilt by association. In response, the government first argues that appellants waived their objections to this evidence at trial because they did not object during opening and closing arguments when the government referred to this evidence, nor did they object to the admission of testimony regarding the guilty pleas. On this basis, the government argues that we must review the district court's rulings for plain error only.
 
 
 15
 We believe appellants sufficiently preserved their objections to the admission of this evidence by opposing the government's motion in limine concerning the admissibility of this evidence and by objecting to the admission of the written plea agreements at trial. Thus, we review the district court's admission of this evidence under the abuse of discretion standard.
 
 
 16
 In the Eighth Circuit, the law is clear that "a confederate's guilty plea is admissible, even on the Government's direct examination of the witness, as evidence of the witness's credibility, or of his acknowledgement of participation in the offense." ... The witness's plea or evidence thereof, however, "cannot be used as substantive evidence of the defendant's guilt, and the jury should be so instructed."
 
 
 17
 United States v. Kroh, 915 F.2d 326, 331 (8th Cir.1990) (en banc) (Kroh ) (emphasis in original) (citations omitted). Moreover, in United States v. Drews, 877 F.2d 10, 12 (8th Cir.1989), this court held that it was not an abuse of discretion to admit into evidence the written plea agreements of co-conspirators where the jury was instructed that the guilty pleas were not evidence of substantive guilt but were admitted only to establish the witness's credibility or acknowledgement of participation in the offense. In the present case, the jury was properly instructed on the limited admissibility of the plea and conviction evidence. Thus, we hold that the district court did not abuse its discretion in admitting evidence of the alleged co-conspirators' guilty pleas and convictions.
 
 
 18
 Bennett additionally argues that it was an abuse of discretion for the district court to admit, under Rule 801(d)(2)(E) of the Federal Rules of Evidence, statements of alleged co-conspirators. In order for a co-conspirator's statement to be admissible under Rule 801(d)(2)(E), the government must demonstrate, by a preponderance of the evidence, "that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.' " Bourjaily v. United States, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987) (Bourjaily ). Bennett contends that the district court failed to make adequate findings as to the nature, scope, and members of the alleged conspiracy or as to whether the co-conspirators' statements were made during and in furtherance of the conspiracy. In ruling on the admissibility of co-conspirators' statements in the present case, the district court followed the procedures outlined in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir.1978) (Bell ) (court may conditionally admit proffered co-conspirator statements during trial and rule on admissibility at conclusion of all evidence). At the close of the evidence, the district court specifically found that the government had met its burden of proving by a preponderance of the evidence the requirements set forth in Bourjaily. There was substantial independent evidence in the record establishing the existence of the conspiracy, its members, and its scope. The disputed statements were made during and in furtherance of the conspiracy. Finding no error, we hold that the district court did not abuse its discretion in admitting evidence of co-conspirator statements under Rule 801(d)(2)(E).
 
 
 19
 Appellants contend that it was an abuse of discretion for the district court to allow the government to introduce, under Fed.R.Evid. 404(b), evidence of a bid-rigging/market allocation scheme--separate from the charged conspiracy--allegedly involving MBE and Misle in South Dakota between 1978 and 1982. The district court instructed the jury that this evidence was admissible only against MBE and Misle. At the time the evidence was proffered, the district court admitted it conditionally; then, at the close of the government's case, the district court ruled the evidence was admissible to show intent. The district court declined to instruct the jury on the limited purpose of the Rule 404(b) evidence at the time it was conditionally introduced and instead chose to give such a limiting instruction only at the close of the evidence. Citing Fed.R.Evid 105,[3] appellants also argue that even if the evidence was admissible for a limited purpose under Rule 404(b), the district court erred in failing to instruct the jury on its limited admissibility each time such evidence was conditionally introduced.
 
 
 20
 The district court acted within its discretion in admitting this evidence on the specific ground that it was relevant to and probative of MBE and Misle's knowledge and general intent. Fed.R.Evid. 404(b). A central issue at trial was whether appellants possessed the requisite intent to engage in the conspiracy. Misle denied knowledge that bid-rigging occurred at meetings he attended or knowledge that his employees were participating in the program, thus raising a specific issue as to his and MBE's possible lack of intent due to mistake or absence of knowledge. Accordingly, we find no abuse of discretion in the admission of this evidence. Compare United States v. Suntar Roofing, Inc., 897 F.2d 469, 479-80 (10th Cir.1990) (district court did not abuse discretion in admitting similar acts evidence in antitrust conspiracy case where such evidence was probative of knowledge, intent, or lack of mistake and where safeguards against unfair prejudice were used). Although it would have been preferable for the district court to give the limiting instruction to the jury both at the times the Rule 404(b) evidence was conditionally admitted and at the close of the evidence, the court's procedure complied with Rule 105 and did not constitute error.
 
 
 21
 Appellants also argue that the district court abused its discretion in allowing some of the government's lay witnesses to give opinion testimony as to whether "agreements" to fix prices and allocate the market had been reached. Appellants argue that under Rule 701 of the Federal Rules of Evidence this was improper opinion testimony by non-expert witnesses. Appellants contend that--in a conspiracy case--permitting such lay testimony creates a significant danger that the jury will give too much weight to an essentially legal conclusion that an "agreement" was reached. Appellants cite another conspiracy case, United States v. Baskes, 649 F.2d 471, 478 (7th Cir.1980) (Baskes ), cert. denied, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981), to support their position that this testimony was improper. We agree that Baskes is instructive on this issue, but not that it supports appellants' position. In Baskes, the Seventh Circuit found no abuse of discretion when the district court excluded lay witness testimony regarding whether conduct was "unlawful" or "wilfull" or whether persons had "conspired." By contrast, the Baskes court recognized that lay testimony is permissible when it refers to whether there has been an "agreement," "understanding," "promise," or "commitment" to fix prices because "those words have well-established lay meanings and do not demand a conclusion as to the legal implications of conduct." Id. at 478 & n. 5, citing United States v. Standard Oil, Co., 316 F.2d 884, 889-90 (7th Cir.1963) (in price-fixing conspiracy case, district court erred in sustaining government's objections to questions regarding whether defendants' employees made any "agreement"). We hold that in the present case the district court did not abuse its discretion in permitting lay witnesses to testify as to whether an agreement had been reached.
 
 
 22
 Finally, we review the district court's admission of historical evidence concerning appellants' involvement in the program prior to the applicable limitations date of May 4, 1985. While appellants concede that the law permits the introduction of evidence related to events predating the limitations period, they contend that most of the evidence in the present case refers to events so remote in time that its admission violated their right to due process. Evidence regarding the course of conduct engaged in by the appellants over a period of years leading up to the indictment period was admissible to show intent. Kansas City Star Co. v. United States, 240 F.2d 643, 650-51 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). Thus, we would be warranted in finding reversible error only if the probative value of this evidence was so substantially outweighed by the danger of unfair prejudice or confusion to the jury as to demonstrate an abuse of the district court's discretion. Fed.R.Evid. 403. We hold that the district court acted within its sound discretion in admitting the historical evidence concerning the conspiracy.
 
 Jury Instructions
 
 23
 Appellants additionally argue that the jury instructions erroneously stated the government's burden to prove appellants' intent and the existence of an agreement and that the instructions overemphasized the government's multiple theories of liability. Misle also challenges the district court's instruction on the liability of a company official for the acts of a subordinate, and Bennett challenges the court's instruction on withdrawal from the conspiracy.
 
 
 24
 We disagree with appellants' contention that Instructions Nos. 10[4] and 22,[5] taken together, erroneously instructed the jury to conclusively presume that the government had proven intent or the existence of an agreement, both of which are essential elements of the offense with which appellants were charged. See United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Instruction No. 10 merely informed the jury that certain types of agreements are treated as per se illegal under the Sherman Act, consistent with applicable case law. See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979) (price-fixing agreements among competitors are conclusively presumed illegal without further examination under the rule of reason; they are per se illegal); Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (market allocation and price-fixing agreements are among those which courts have deemed per se illegal under the Sherman Act); United States v. Bensinger Co., 430 F.2d 584, 589 (8th Cir.1970) (bid rigging agreement "is a price-fixing agreement of the simplest kind, and price-fixing agreements are per se violations of the Sherman Act."). Nor do we agree with appellants that by giving Instructions Nos. 17, 18 and 19 (defining bid-rigging, price-fixing, and customer allocation, respectively), the district court improperly overemphasized the government's multiple theories of liability or that these instructions were given without an evidentiary foundation. We hold that the jury instructions, read as a whole, fairly and accurately stated the government's burden of proof and the essential elements of the offense charged.
 
 
 25
 Misle separately argues that the district court erred in giving Instruction No. 25 stating circumstances under which he, as a company official, could be found criminally liable for the acts of a subordinate. In particular, Misle claims that the following portion of the instruction misstated the law and eliminated intent as an essential element of the government's burden of proof:
 
 
 26
 To find [Misle] liable for the acts of a subordinate, you must find beyond a reasonable doubt that he was aware of the existence of the conspiracy, and:
 
 
 27
 ....
 
 
 28
 b. that he was in a position to stop a subordinate who he knew was participating in that conspiracy from further participation, but failed to do so.
 
 
 29
 A company official who knowingly participates in a conspiracy in this manner is liable to the same extent as any other member of the conspiracy.
 
 
 30
 Instruction No. 25 was proposed by both the government and Misle during trial. It was taken from the ABA's Sample Jury Instructions in Criminal Antitrust Cases (1984). Although Misle submitted this exact instruction to the district court as part of his requested jury instructions, he later objected to it at the instruction conference on grounds that there was an insufficient basis in the evidence to establish that he was a company official. The district court ruled that the evidence was sufficient to submit the instruction to the jury and we agree; the evidence showed that Misle remained active in his company, MBE, and continued to participate personally in the program, as late as March 1986. The government also points out that Misle never objected to Instruction No. 25 during trial on grounds that it misstated the law; therefore, we may only review this aspect of instruction for plain error. We hold, in any case, that this instruction does not misstate the law or eliminate the element of intent. See, e.g., United States v. Gillen, 599 F.2d 541, 547 (3d Cir.) ("When a company president has knowledge that his company is involved in a price-fixing conspiracy and takes no action to stop it, he may not insulate himself from liability by leaving the actual execution of the scheme to his subordinates."), cert. denied, 444 U.S. 866, 100 S.Ct. 137, 62 L.Ed.2d 89 (1979).
 
 
 31
 Bennett separately argues that the district court erred in instructing the jury on withdrawal from a conspiracy.[6] According to Bennett, the district court should have found that he had withdrawn from the conspiracy as a matter of law and so directed the jury. Bennett contends that the evidence demonstrated without dispute that he left the conspiracy for several years while he was working for United Bus and was assigned to an area in eastern Iowa during the early 1980s--prior to May 4, 1985, the triggering date for statute of limitations purposes--and that the government admitted this fact when the government's attorney stated in closing argument that Bennett had "left the conspiracy." We hold that the district court did not err in submitting the issue of withdrawal to the jury in light of the substantial evidence indicating that Bennett had re-entered the conspiracy prior to May 4, 1985, and remained a member of the conspiracy after that date.
 
 Sentencing
 
 32
 Finally, we hold appellants' arguments concerning the excessiveness of their sentences to be without merit. The district court sentenced appellants in this non-Guidelines case well within the statutory maximums and we decline to review them on appeal. See, e.g., Dorszynski v. United States, 418 U.S. 424, 440-41, 94 S.Ct. 3042, 3051, 41 L.Ed.2d 855 (1974); United States v. Enterline, 894 F.2d 287, 291 (8th Cir.1990); United States v. Boone, 869 F.2d 1089, 1092-93 (8th Cir.), cert. denied, 493 U.S. 822, 110 S.Ct. 81, 107 L.Ed.2d 47 (1989). Moreover, in claiming that the district court sentenced appellants on the basis of a factually inaccurate consideration, appellants misconstrue the district court's stated reasons for the sentences it imposed. The district court specifically stated that the sentences were "necessary to reflect the seriousness of the offense, to promote respect for the law, ... to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct." These were all appropriate factors to be considered in imposing appellants' sentences.
 
 
 33
 Accordingly, the judgments of the district court are affirmed.
 
 
 
 [1]
 The Honorable William G. Cambridge, United States District Judge for the District of Nebraska
 
 
 [2]
 The district court's instruction on the essential elements of the offense charged in the superseding indictment stated the following:
 The superseding indictment charges each defendant with the crime of conspiracy to unreasonably restrain interstate trade or commerce by rigging bids, setting prices, and allocating customers with respect to the sale of buses and bus bodies to public school districts in Nebraska and western Iowa. To convict a defendant of that crime, the burden is upon the United States to establish beyond a reasonable doubt each of the following essential elements as to that defendant:
 One, between at least as early as 1978 and at least into March, 1986, two or more persons reached an agreement or came to an understanding to unreasonably restrain interstate trade or commerce by rigging bids, setting prices, and allocating customers with respect to the sale of buses or bus bodies to public school districts in Nebraska and western Iowa;
 Two, such defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;
 Three, at the time such defendant joined in the agreement or understanding, such defendant knew the purpose of the agreement or understanding; and
 Four, that the conspiracy charged in the superseding indictment either substantially affected interstate trade or commerce in goods or services, or occurred within the flow of interstate trade or commerce in goods or services.
 If the United States has proved beyond a reasonable doubt each and all of the foregoing essential elements as to the particular defendant under consideration by you, then you should find that defendant guilty of the crime charged in the superseding indictment. If the United States has failed to prove beyond a reasonable doubt any one of the foregoing essential elements as to a particular defendant under consideration by you, then you should find that defendant not guilty of the crime charged in the superseding indictment.
 
 
 [3]
 Fed.R.Evid. 105 states: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."
 
 
 [4]
 Instruction No. 10, referring to agreements that are per se illegal under the Sherman Act, informed the jury:
 The Sherman Act makes unlawful certain agreements which, because of their harmful effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable restraints on trade without inquiry about the precise harm they have caused or the business excuse for their use. Included in this category of unlawful agreements are those agreements the terms of which fix prices, allocate customers, or rig bids; in connection with such an agreement, you need not be concerned with whether the agreement was reasonable or unreasonable, or the justifications for the agreement, or the harm done by it, and it is not a defense that the parties thereto may have acted with good motives, or may have thought that what they were doing was legal, or that the conspiracy may have had some good results.
 
 
 [5]
 Instruction No. 22, referring to intent, told the jury:
 In considering the evidence in this case, you must determine whether the defendant under consideration by you acted with the requisite intent. This element of intent is established if the evidence in this case shows beyond a reasonable doubt that the defendant under consideration by you knowingly participated in a conspiracy to engage in the conduct charged in the indictment. Intent means that the acts of the defendant under consideration by you were voluntary and intentional--that is, that they were knowingly done. In order to establish the offense charged in the indictment, the proof need not show that a defendant acted willfully or with specific intent or bad purpose either to disobey or to disregard the law.
 
 
 [6]
 Instruction No. 15 informed the jury that a person, once found to be a member of a conspiracy, may also be found to have withdrawn from the conspiracy if that person "did some affirmative act inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators." The district court further instructed the jury that even if a person has withdrawn from a conspiracy, he or she may re-enter the conspiracy thus reviving his or her potential liability as of the date of re-entry. Bennett does not dispute the accuracy of the district court's statement of the law in Instruction No. 15 but rather contends that the district court erred in submitting the issue of withdrawal to the jury