STATE OF MAINE            SUPERIOR COURT
PENOBSCOT, SS.           CRIMINAL ACTION
Docket No. CR-05-209



State of Maine

v.           Order (Motion to Suppress)

Robert J. Crocker

Pending before the court is the defendant's motion to suppress. Hearing was held on the motion, at which the defendant appeared with counsel.

In January 2005, Bangor Police Officer Tourtelotte and Sergeant Thomas Reagan were investigating several transactions that involved the use of counterfeit money. As part of the investigation, they went to the apartment of one Toby Thurston. Thurston was present and allowed the officers into the premises. The apartment is a small, two-room unit. The entry used by the officers opened into a kitchen. The entrance to the second room is through a doorway from the kitchen area. A curtain was drawn across the doorway, leaving a gap of two or three inches. Tourtelotte and Reagan proceeded into the kitchen. Looking through the gap between the curtain and the doorframe, the officers observed the legs of another person (the defendant) who was present in the other room. Tourtelotte remained in the kitchen with Thurston, while Reagan opened the curtain and walked into the second room to determine who was there. Reagan asked the defendant to produce some identification and then walked to the far side of the room to get a better view of the defendant. From that vantage point, Reagan observed a computer monitor with an image of a $20 bill, images of American currency that had been printed on ordinary paper and apparently trimmed strips of paper. Reagan then conducted a pat down search of the defendant, which produced a pocketknife and keys connected to a container of mace. He asked the defendant if he had anything else, and the defendant

1

gave Reagan his wallet, which contained plainly counterfeited $20 bills. The defendant was arrested and, after he was advised of his Miranda rights, interrogated.

The defendant has moved to suppress evidence that Reagan gained through his entry into the room where the defendant was present. The state's sole argument in support of the lawfulness of the search is that Reagan's entry into the room was constitutionally justified because it was motivated by concerns for officer safety.[1]

The parties have not provided authority dispositive of the issue at bar. The court finds guidance in caselaw that examines when a police officer is allowed to conduct a "protective sweep" of a residence, when that search is incident to an arrest and is performed to protect the safety of the officers who are present on the premises. Such a search, which is limited to a "cursory inspection of those spaces where a person may be found," must be supported by the existence of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334-35, 108 L.Ed.2d 276, 286-87 (1990); *see generally* 3 LaFave, SEARCH AND SEIZURE § 6.4(c) (4th ed. 2004). The reasonableness of such a search is grounded on the interest of allowing police officers, who are arresting or have arrested an occupant, to assure themselves that there are no other people "who are dangerous and who could unexpectedly launch an attack." *Buie,* 494 U.S. at 333, 108 L.Ed.2d at 285. The same concept applies when an officer enters a residence with the consent of the resident and when the legality of a search is not predicated on the fact of an arrest. Drawing on law that determines when a protective sweep may be effected as part of an arrest process, one court has held that if police officers are lawfully in a residence pursuant to the occupant's consent, the officers "were "permitted to conduct a protective search of part or all of the residence if the officers reasonably believed that there might be other persons on the premises who could pose some danger to them." *United States v. Gilbert*, 774 F.2d 962, 964 (9th Cir. 1985).

In the case at bar, Tourtelotte and Reagan entered the apartment with Thurston's consent. While in the kitchen, the officers saw that another person was in an adjacent

---

[1] The state does not argue that Thurston consented to the officers' entry into the adjoining room, and the evidence would not support such a contention.

room. The resulting question focuses on the extent of any authority the officers were entitled to exert over that person (the defendant) in order to promote the goal of officer safety, within the limits prescribed by the fourth amendment. As those limits have been defined in the situation where a person in Thurston's circumstances was arrested, the scope of a protective sweep would be established by the existence of circumstances that justified the officers' belief that any person who might be present poses a danger to them. Here, the record reveals that there were no circumstances unique to the situation in the Thurston residence that would support such an apprehension. For example, the officers did not observe the defendant or a third person engaging in any threatening conduct. Rather, the evidence is simply that the defendant was present in the room adjacent to the kitchen. The only circumstance that arguably could support a reasonable apprehension of danger was the bald fact that the officers were present in the apartment in connection with a criminal investigation.

The situation at bar differs from those presented in the cases noted above because here the officers, through their legitimate observations from the kitchen, were aware of the presence of a third person (namely, the defendant) on the premises of the person with whom they initially wanted to make contact (namely, Thurston). Nonetheless, even those cases impose a requirement that to conduct a protective sweep, an officer must have reason to suspect not only that another person may be on the premises, but that the person poses a danger to the officers. Here, the officers knew that the defendant was in the adjoining room. The question therefore is whether, knowing of the defendant's presence, one or both officers were entitled to draw open the curtain that partially concealed the defendant in the adjoining room and then enter that room to promote the goal of officer safety. For purposes of this motion, the court assumes – without deciding – that interests of officer safety justified Reagan in opening the curtain, so that he could observe the defendant and the defendant's immediate surroundings.

The evidence establishes that Reagan did not see any evidence of criminal conduct until he entered the room and walked across it to get a better view of the defendant, and there is no evidence that Reagan saw anything that would pose a threat to Tourtelotte or himself until he detained the defendant in the room. However, the evidence does not reveal why or to what extent Reagan's initial vantage point from the

kitchen was inadequate or why Reagan would be in better position to protect himself and Tourtellote if he moved to a position on the far side of the room, rather than monitoring the defendant from the doorway. In other words, to the extent established on this record, the goal of officer safety was not advanced when Reagan entered the room adjoining the kitchen. For this reason, the state has not demonstrated any need for Reagan to enter the room where the defendant was located and in which Reagan ultimately made observations of material incriminating to the defendant. Because of the absence of particularized evidence justifying the intrusion into the interior room, the state's argument would dispense with any meaningful requirement that when an officer may enter into a room without consent and detain someone in the defendant's situation, there must be an objective basis for concerns of officer safety or the destruction of evidence.

Further, there is insufficient evidence about the nature of the investigation that would justify the officer's conduct affecting the defendant's constitutional interests. It has been noted that an important factor used to determine the presence of a threat to officer safety is the seriousness of the criminal activity that the police are investigating. LaFave, *supra* at § 6.4(c). Here, however, the record suggests that Reagan and Tourtelotte were looking for Thurston after they had arrested several other people for using counterfeit money. There is no evidence of the role – if any -- that, as the officers understood it, Thurston may have had in that scheme or of any other information about the circumstances of the alleged criminal enterprise. In the absence of such evidence, the state has not established that the nature of the investigation by itself would generate reasonable concerns that the officers would be in danger at Thurston's residence.

The entry shall be:

For the foregoing reasons, the defendant's motion to suppress is granted. All evidence obtained as a result of the officers' entry into the room where the defendant was located is suppressed and excluded from evidence.

Dated: November 16, 2005

_____

Justice, Maine Superior Court

4

MEMO FROM DESK OF
GIN  HAWLEY
561-2302
e-mail: virginia.hawley@maine.gov

November 17, 2005

State of Maine v Robert Crocker
Penobscot County Superior Court
Docket No. BANSC-CR-2005-209

Attorneys of Record:

State's Attorney:
     Alice Clifford, Ass't District Attorney
     Office of the District Attorney
     97 Hammond Street
     Bangor, ME 04401

Defense Counsel:
     Wayne R. Foote, Esq.
     PO Box 1576
     Bangor, ME 04402-1576